

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, NY 10278*

June 18, 2024

**BY ECF**
The Honorable P. Kevin Castel
United States District Judge
500 Pearl Street
New York, New York 10007

> Re:     *United States v. Juan Felipe Rodriguez*, 21 Cr. 639 (PKC)

Dear Judge Castel:

        The Government respectfully submits this letter in advance of sentencing.  The Government respectfully submits that a sentence above the 13 months sought by the defense, and commensurate with the 38 months imposed on codefendant Jesus Alejandro Elizondo Santos, but below the 48 months imposed on codefendant Pablo Jaramillo, which would amount to a sentence below the applicable Guidelines range of 70 to 87 months, would be sufficient but not greater than necessary to serve the purposes of sentencing.

## I.   OFFENSE CONDUCT

        The defendant participated in a drug trafficking organization (the "DTO") that, between approximately April 2021 and June 2021, was responsible for trafficking at least 123 kilograms of cocaine that moved from Colombia to Mexico and then to the United States, including in New Jersey and New York.  The DTO included a number of coconspirators.  One coconspirator ("CC-1"), who was predominantly based in Florida, had a business relationship with an individual in Mexico ("CC-2") who could arrange the transport of large quantities of cocaine from Colombia through Mexico and into the United States, up to the New York / New Jersey area.  Another coconspirator ("CC-3"), who was also predominantly based in Florida, was a business partner of CC-1's.  CC-3's roles included, among other things, brokering connections with individuals in the New York / New Jersey area who would be able to sell the cocaine.  Specifically, CC-3 recruited into the DTO Jaramillo, who lived and owned a restaurant in New Jersey, and who claimed to have connections to individuals in the area who could sell the cocaine in New York and New Jersey. (PSR ¶¶ 10-11).

        The defendant, who was predominantly based in Florida during the immediate lead-up to his participation in the DTO, was recruited into the DTO by CC-1.  In May 2021, the defendant, at CC-1's direction, traveled from Florida to New Jersey, where, over the course of a few days, the defendant acted as CC-1's "boots on the ground" as the DTO was establishing its operations. To that end, once the defendant arrived in New Jersey, he met with another New Jersey-based coconspirator ("CC-4"), who was also representing CC-1's interests.  CC-1 had already explained to CC-4 that CC-1 was sending the defendant to meet with CC-4 about a job that would entail CC-4 picking up ten kilograms of cocaine that would be shipped to New Jersey.  When the defendant

met CC-4, the defendant further explained to CC-4 that this would be an ongoing operation, and that, the next day, the defendant and CC-4 would go meet with CC-3.  That is, in fact, what happened the next day:  The defendant and CC-4 met with CC-3, who had traveled from Florida to New Jersey for the purpose of connecting CC-1's representatives (*i.e.*, the defendant and CC-4) with Jaramillo and the potential purchasers whom Jaramillo was meant to introduce.  To that end, several members of the DTO met at Jaramillo's restaurant in New Jersey to broker connections.  That meeting was attended by the defendant and CC-4 (on behalf of CC-1); CC-3; Jaramillo; and a potential purchaser whom Jaramillo brought to the meeting ("CC-5").  CC-5, who purported to be able to sell the cocaine to individuals in New York and New Jersey, agreed to purchase the cocaine.  (PSR ¶¶ 12-13).  Jaramillo was paid for brokering those introductions, and Jaramillo was supposed to receive a percentage of each kilogram of cocaine that CC-5 sold.  (*See* Dkt. 27 at 1).

Following that meeting, the first ten kilograms of cocaine—a "test run"—arrived in New Jersey, and CC-1 directed CC-4 to pick up and pay for the shipment.  The defendant, at CC-1's direction, accompanied CC-4 in doing so.  CC-3 accompanied them as well.  Once they had the cocaine, to verify for CC-1 that CC-5 would in fact be able to sell the cocaine, the defendant and CC-4 accompanied CC-5 as CC-5 sold several of the kilograms in New Jersey.  The defendant and CC-4 brought the cash from that sale back to CC-3, who was still in New Jersey.  Thereafter, the defendant and CC-3 separately returned to Florida.  (PSR ¶ 14).

Over the next couple weeks in May 2021, the defendant continued to participate in the DTO by having multiple phone calls, including with CC-4.  Specifically, at CC-1's direction, the defendant, by phone, directed some of CC-4's activity in New Jersey.  For example, the defendant instructed CC-4 to bring a kilogram of cocaine to CC-5 at Jaramillo's restaurant, so that CC-5 could sell it.  Similarly, the defendant instructed CC-4 to bring some kilograms to an apartment in New Jersey, where CC-5 sold those kilograms to a customer, as CC-4 stood on and observed.  (PSR ¶ 15).

Following some test runs, including the ten-kilogram shipment described above, CC-1 arranged for a shipment of 100 kilograms of cocaine.  The defendant was aware of the approximate size of that shipment.  (PSR ¶ 15).

In late May or early June 2021, Elizondo Santos, who worked at the direction of CC-2 (based in Mexico), traveled from Texas to New Jersey, where Elizondo Santos met CC-4 at a truck loading depot. CC-4 was driving a vehicle that CC-3 had rented for the purpose of transporting pallets of fruit that had cocaine hidden in them.  At the loading depot, Elizondo Santos ensured that the shipping pallets were removed from the incoming truck and placed into CC-4's vehicle (which CC-3 had rented). Those shipping pallets appeared to contain only fruit.  What the workers at the truck loading depot did not know, but what both Elizondo Santos and CC-4 knew, was that there was cocaine hidden among the shipment.  In fact, that shipment included 100 kilograms of cocaine.  (PSR ¶ 16).

CC-4 then transported those pallets to a warehouse in New Jersey.  CC-3 had rented a unit in that warehouse for the purpose of storing the fruit pallets after the cocaine had been removed from them.  At the warehouse, CC-4 unloaded the cocaine from the pallets and stored the fruit in the warehouse unit.  (PSR ¶ 16).

Later in June 2021, CC-2, who suspected that the DTO was under law enforcement scrutiny, alerted CC-4 that CC-2 was arranging for Elizondo Santos to bring CC-4 a new phone, presumably to safeguard from law enforcement communications between CC-4 and CC-2.  CC-4 told CC-2 that CC-4 was at a hospital in Manhattan.  Elizondo Santos again traveled to New Jersey and then proceeded to that hospital, where he was encountered by law enforcement.  Elizondo Santos told law enforcement, in substance and in part, that Elizondo Santos had been instructed to deliver a phone to an individual at the hospital.  After Elizondo Santos was questioned by law enforcement, he was released.  (PSR ¶ 18).

In total, the DTO transported at least 123 kilograms of cocaine to the New Jersey area.  On June 14, 2021, law enforcement seized 123 kilograms of cocaine after CC-4 attempted to sell approximately 10 kilograms in Manhattan to an individual who, unbeknownst to CC-4, was a confidential source of the Drug Enforcement Administration.  (*See* PSR ¶ 17).

## II.  PROCEDURAL HISTORY AND GUIDELINES RANGE

On August 25, 2022, a grand jury returned a sealed indictment charging the defendant with one count of conspiring to distribute and possess with intent to distribute five kilograms and more of mixtures and substances containing a detectable among of cocaine, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(A).  (PSR ¶¶ 1-2).  On January 29, 2024, the defendant voluntarily surrendered in Colombia.  (PSR ¶ 21).  On April 9, 2024, the defendant pled guilty pursuant to a plea agreement to the one count in the indictment.  (PSR ¶¶ 2, 4).  That charge typically carries a maximum term of imprisonment of life, a mandatory minimum term of imprisonment of ten years, a maximum term of supervised release of life, a mandatory minimum term of supervised release of five years, a maximum fine, pursuant to Title 18, United States Code, Section 3571, and Title 21, United States Code, Section 841(b)(1)(A), of the greatest of $10,000,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to persons other than the defendant resulting from the offense, and a $100 mandatory special assessment.  (PSR ¶¶ 76, 79, 83-84).  Here, however, the defendant appears to meet the "safety valve" criteria set forth in Title 18, United States Code, Section 3553(f), and is therefore not subject to the mandatory minimum terms of imprisonment and supervised release.  (PSR ¶¶ 76, 79).

The parties, through the plea agreement, and Probation, through the PSR, agree that the applicable Guidelines range is 70 to 87 months based on these calculations:

The Guideline applicable to the offense charged in the indictment is U.S.S.G. § 2D1.1. Pursuant to U.S.S.G. §§ 2D1.1(a)(5) and 2D1.1(c)(3), because the offense involved at least 50 kilograms but less than 150 kilograms of cocaine, the base offense level is 34.  Pursuant to U.S.S.G. § 2D1.1(b)(18), because the defendant meets the criteria set forth in U.S.S.G. §§ 5C1.2(a)(1)-(5), two levels are subtracted.  Pursuant to U.S.S.G. §§ 3E1.1(a) and 3E1.1(b), because the defendant accepted responsibility, three levels are subtracted.  Pursuant to U.S.S.G. § 4C1.1(a), because the defendant meets the criteria set forth in U.S.S.G. §§ 4C1.1(a)(1)-(10), two levels are subtracted.  In accordance with the above, the applicable Guidelines offense level is 27. (PSR ¶¶ 5, 25-35).

Based upon the information now available to the Government (including representations by the defense), the defendant has no criminal history points.  In accordance with the above, the defendant's Criminal History Category is I.  Based upon the calculations set forth above, the defendant's applicable Guidelines range is 70 to 87 months.  (PSR ¶¶ 5, 39, 77).

Probation recommends a sentence of 48 months.  (PSR at p. 26).

## III.  CODEFENDANTS' SENTENCES

Jaramillo, a naturalized citizen (Dkt. 69 at 6), faced a Guidelines range of 87 to 108 months, Probation recommended 36 months, the defense sought home confinement, and the Government requested an incarceratory sentence below the Guidelines range (Dkt. 27 at 2-3).  The Court sentenced Jaramillo to 48 months.  (PSR ¶ 7).

Elizondo Santos, a noncitizen subject to removal (Dkt. 83 at 2), faced a Guidelines range of 70 to 87 months, Probation recommended 54 months, the defense sought 24 months, and the Government requested a sentence above the 24 months sought by the defense but below the 48 months imposed on Jaramillo (Dkt. 78 at 3-4).  The Court sentenced Elizondo Santos to 38 months.  (PSR ¶ 8).

## IV.  DISCUSSION

The combination of the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, and to afford adequate deterrence to criminal conduct, and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, weighs in favor of a sentence above the 13 months sought by the defense, and commensurate with the 38 months imposed on Elizondo Santos, but below the 48 months imposed on Jaramillo, which would amount to a sentence below the applicable Guidelines range of 70 to 87 months.

A substantial term of imprisonment is necessary to capture the nature and circumstances of the offense, to reflect the seriousness of the offense, and to provide just punishment. The defendant, at CC-1's direction, traveled to the New York / New Jersey area to be CC-1's "boots on the ground" during a crucial period when the DTO was establishing its operations.  To that end, the defendant, at CC-1's direction, brought CC-4 into the fold and connected CC-4 with CC-3. Similarly, the defendant attended the introductory meeting at Jaramillo's restaurant, which brought together individuals representing the key components of the conspiracy.  Thereafter, the defendant, serving as CC-1's "eyes and ears," shadowed CC-4 as CC-4 obtained the ten-kilogram test run, and shadowed CC-5 as CC-5 sold several of those kilograms.  The defendant and CC-4 brought the cash from CC-5's sales back to CC-3.  Even after the defendant departed the New York / New Jersey area, he continued to participate in the DTO by serving as an intermediary in conveying CC-1's directions to CC-4.  To that end, on one occasion, the defendant directed CC-4 to bring cocaine to CC-5 at Jaramillo's restaurant, and, on another occasion, the defendant directed CC-4 to bring cocaine to a particular apartment in New Jersey, where CC-5 sold it to a customer.  Such tangible participation in the DTO is serious conduct deserving of punishment.

A substantial term of imprisonment is also necessary to promote respect for the law and to afford adequate deterrence to criminal conduct, not only for the defendant specifically, but also for society generally. The defendant and others who participate in the trafficking of dangerous substances must understand that their actions negatively impact our communities and that those who perpetuate the drug problem in this Country will be punished appropriately.

Although the defense raises valid points in mitigation (*see generally* Dkt. 87), the defense's requested sentence of 13 months would not be sufficient to serve the retributive and deterrent purposes of sentencing discussed above. In addition, the defendant is similarly situated to Elizondo Santos, and the defense's efforts to distinguish them fall flat, such that the defense's requested sentence of a term of imprisonment roughly one third the length of the term imposed on Elizondo Santos would create unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. To be sure, Elizondo Santos traveled to the New York / New Jersey area twice, whereas the defendant made the trip only once, and Elizondo Santos was personally present for part of the 100-kilogram shipment, whereas the defendant was personally present for part of only the 10-kilogram test run. But the defendant continued to participate in the conspiracy even after his single trip to the New York / New Jersey area by continuing to serve as a conduit for CC-1's instructions to CC-4. And the defendant committed his actions in furtherance of the conspiracy fully aware that the conspiracy would be responsible for trafficking far more than a 10-kilogram test run; in fact, the defendant explained as much to CC-4 when the defendant, at CC-1's direction, read CC-4 into the details of the conspiracy that CC-4 would be joining.

At the same time, the history and characteristics of the defendant and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct call for a sentence below the 48 months imposed on Jaramillo. Both the defendant and Elizondo Santos were less culpable than Jaramillo. For one thing, Jaramillo recruited into the DTO at least one additional individual, CC-5, and Jaramillo made his place of business (his restaurant) available as an important meeting spot for the DTO, whereas the Government has no evidence that either the defendant or Elizondo Santos recruited others into the DTO or chose locations for the DTO to meet. Similarly, so far as the Government is aware, Jaramillo had greater insight into the potential scope of the conspiracy than the defendant and Elizondo Santos. That is to say, Jaramillo recruited CC-5 into the DTO because Jaramillo believed that CC-5 would be able to purchase, and resell, kilograms of cocaine on an ongoing basis—that is why Jaramillo not only was paid for brokering the introduction to CC-5 but also was supposed to get a cut of every kilogram that CC-5 sold. The Government lacks comparable evidence reflecting the defendant's or Elizondo Santos's insight into the scope of the conspiracy. Finally, Jaramillo had a prior conviction, albeit a relatively minor one from when he was 18 years old (Dkt. 27 at 2), whereas neither the defendant nor Elizondo Santos has any prior convictions (Dkt. 78 at 3; PSR ¶ 38). The Government notes for the Court's consideration that the defendant is a U.S. citizen (PSR p. 2), and, in that regard, the defendant is like Jaramillo and unlike Elizondo Santos.

## V.  CONCLUSION

The Government respectfully submits that a sentence above the 13 months sought by the defense, and commensurate with the 38 months imposed on Elizondo Santos, but below the 48 months imposed on Jaramillo, which would amount to a sentence below the applicable Guidelines range of 70 to 87 months, would be sufficient but not greater than necessary to serve the purposes of sentencing.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

by: _Samuel P. Rothschild_____
Samuel P. Rothschild
Assistant United States Attorney
(212) 637-2504

cc:    Gary M. Kaufman, Esq. (by ECF)